## In re: Condemnation by Redevelopment Authority

*Robert G. Williamson,* for Redevelopment Authority.

*Charles P. Eyer,* for CONRAIL.

MARSH, *P.J.,* March 27, 1981—This matter concerns the disposition of certain funds deposited with the court on account of certain eminent domain proceedings regarding the condemnation of lands for public use at the East Stroudsburg Railroad Station. On July 16, July 18 and August 8, 1980, evidence was presented to the court in this matter. Thereafter, counsel for Consolidated Rail Corporation and for respondents both submitted proposed findings of fact and conclusions of law. We, therefore, make the following

## FINDINGS OF FACT

1. On March 14, 1978 the Redevelopment Authority (the authority) of Monroe County, Pa., pursuant to its statutory powers of eminent domain, initiated this action by filing a declaration of taking against certain property located in the Borough of East Stroudsburg, Pa.

2. The property so taken by the Authority, particularly described on Exhibit "A" to the declaration of taking, consists of two (2) strips of land (parcel "A" and parcel "B") on either side of the railroad tracks by the railroad station on Crystal Street, in East Stroudsburg; and the entire said station, excepting a canopy overhang, lies within one of those strips (parcel "A"). The authority has taken the said two strips of land, including the railroad station, for incorporation into the Community Development Project for the Borough of East Stroudsburg.

3. Parcel "A" and parcel "B" are taken out of three (3) adjoining tracts of land running lengthwise along (parallel to) Crystal Street. These three tracts are all of:

(a) a one hundred foot strip obtained under an "Agreement for Right-of-Way" given by Franklin Starbird to the Delaware & Cobbs Gap Railroad Company on February 12, 1853 and recorded June 27, 1855 in Monroe County Miscellaneous Book "B", page 266 (the "Franklin Starbird grant").

(b) two tracts on either side of the Franklin Starbird grant obtained by a deed given November 16, 1855 and recorded April 11, 1856 in Monroe County Deed Book Volume 7, page 368, from William Starbird, John Boys and his wife Anna S. Boys, et al., to the Delaware, Lackawanna & Western Railraod Company ("D.L. & W.") (the "William Starbird grant").

4. The Franklin Starbird grant recites that "in consideration of one dollar . . . and in consideration that the (Delaware and Cobb's Gap) Company shall at any time proceed to locate, build and construct their railroad across said land (he) does covenant and agree . . . for right of way . . . so soon as said railroad shall be graded and completed. . . . But if hereafter, it shall be deemed by said Company inexpedient to locate and construct their Railroad as aforesaid, this agreement shall be surrendered and made null and void, but for no other reason and upon no other contingency, shall the same be invalidated or destroyed by either of the parties . . ."

5. The William Starbird grant recites the lands therein are "granted, bargained, sold, conveyed and transferred . . . to have and to hold . . . with the appurtenances unto the said Company, their successors and assigns as long as the same are used for Railroad or Depot purposes."

6. D. L. & W. and the Delaware and Cobbs Gap Railroad Company were succeeded by the Erie-Lackawanna Railway Company ("Erie-Lackawanna").

7. The Consolidated Rail Corporation (CONRAIL) is a Pennsylvania corporation created pursuant to the Regional Rail Reorganization Act of January 2, 1974, 87 Stat. 986, as amended, 45 U.S.C.A. §701 et seq. CONRAIL is the successor-in-title to the Erie-Lackawanna, D. L. & W., and the Delaware and Cobbs Gap Railroad Company.

8. On July 11, 1978, pursuant to an order of this court, the authority paid into court the sum of $86,538.75 as estimated just compensation for the taking of the premises aforementioned. The money was lodged in an interest bearing account which, as of July 1, 1980 contained $96,353.22.

9. On April 21, 1980 CONRAIL petitioned the court to award it the entire aforementioned fund, including interest. Inter alia, the petition:

(a) averred, without admitting, that those entitled to claim reversionary or remainder interests, if any, arising from the Franklin Starbird grant and the William Starbird grant are the descendants, heirs, or assigns of one James H. Stroud, who died intestate in 1878;

(b) averred that at the time the declaration of taking was filed, two bond indentures against the D. L. & W. were recorded and still open in Monroe County, both having been recorded in 1950 and having as trustees, respectively, the Morgan Guaranty Trust Company ("Morgan") and the Bankers Trust Company ("Bankers"); and

(c) averred that, under the circumstances of the case, none holding any such reversionary or remainder interests, if any, had any claim to the fund, and that, because the trustees of the Erie-Lackawanna conveyed all of its Monroe County

434

property to CONRAIL free and clear of all liens, neither did Morgan or Bankers.

10. Pursuant to the service order made under CONRAIL's petition, it was posted on the railroad station and a summary of it was published in The Pocono Record and the Monroe County Legal Journal. Copies of the petition, with advisory letters, were mailed to Bankers, to Morgan, and to such descendants of Mr. Stroud as CONRAIL could find.

11. The case was heard on July 16, 1980 and July 18, 1980 and August 11, 1980. No one appeared, or has otherwise responded, for Morgan or Bankers. Certain members of the Vail family, who assert rights to the fund because of descent from James H. Stroud, did appear and were represented.

12. The parties participant have stipulated: (1) whatever reversionary or remainder interests arose out of the Franklin Starbird grant and the William Starbird grant, if any, vested in James H. Stroud; and (2) CONRAIL is the successor-in-title of the D. L. & W. and the Delaware and Cobbs Gap Railroad Company.

13. Franklin Starbird and James H. Stroud were among the "commissioners" authorized by the Pennsylvania legislature to organize the Delaware and Cobbs Gap Railroad Company under the Act of February 19, 1849, P.L. 79. Act No. 470, April 7, 1847 (CONRAIL JN2).

14. Parcel "A" taken by the authority, comprising 29,379 square feet bordering Crystal Street, is primarily out of the Franklin Starbird grant; however, a narrow strip immediately adjacent to Crystal Street, consisting of 8513 square feet, is out of the William Starbird grant.

15. Parcel "B" taken by the authority, comprising 23,736 square feet bordering what formerly was South Kistler Street, is wholly out of the William Starbird grant.

16.  The premises remaining outside parcels "A" and "B" are partly from the Franklin Starbird grant and partly from the William Starbird grant. Between the parcels, and within the Franklin Starbird grant entirely, are a canopy overhang which is part of the railroad station, three laid railroad tracks, a switch, and the switch tower at Analomink Street. Between the parcels, and within the William Starbird grant entirely, are a pole line and a wooden "no trespassing" sign. Between the parcels, and partially within both grants, are a small block building (bungalow) adjacent to the switch tower and a fourth laid track. Outside the parcels, not between them but in their immediate vicinity, and within the Franklin Starbird grant, are another switch (No. 23) and a fifth laid track terminating at a bumper block. Outside the parcels, not between them but in their immediate vicinity, and within the William Starbird grant, are two large propane tanks.

17.  The D. L. & W. which sprung from the 1853 merger of the Delaware and Cobbs Gap Railroad Company and the Lackawanna and Western Railroad Company, ran its first train across the premises on or about May 13, 1856. About this time, there was a station at the corner of Analomink and Crystal Streets. The present station was erected in 1864.

18.  Throughout the latter years of the 19th century and well into the middle years of the 20th, the D. L. & W. grew and prospered. It maintained both passenger and freight service to and through East Stroudsburg. In 1960, it merged with the Erie Railroad to become the Erie-Lackawanna. Over recent years, however, the railroad has been on the decline.

19.  Railroad traffic passing by the East Stroudsburg railroad station, which at one time was sub-

stantial, has diminished, but has not stopped. Passenger service ended January 5, 1970. Thereafter, a freight agent was at the station until CONRAIL supplanted the Erie-Lackawanna on April 1, 1976. Through freight trains bearing coal from the Pittston, Pennsylvania area passed by at the rate of ten to twelve monthly until July of 1979. Local freight service, which at various times employed engines stationed at East Stroudsburg, Scranton and (now) Bangor, Pa., persisted and, as of August, 1980, was still running several times weekly.

20. While though freights ran by the station, all of the tracks there were employed. The local service must pass before the station on its way to and from the industries it serves. It, too, has employed, and as of August, 1980 continued to employ, all of the tracks there, excepting perhaps the "spur" ("pit" or "shop") track partially in the William Starbird grant. This employment includes the switching and standing of cars on the tracks in front of the station. As of August, 1980 and for at least several years before then, the track terminating at the bumper block was employed as a place to stand cars for the service of local industries not otherwise on the line. As of August, 1980, the switch to the "spur" track was working, as was the other switch (No. 23) within the Franklin Starbird grant, the latter being one used to perform some of the switching functions in the station area.

21. The Erie-Lackawanna Railway Company, a predecessor in interest to Consolidated Rail Corporation, leased a portion of the East Stroudsburg railraod station structure to the Borough of East Stroudsburg, by lease agreement dated June 5, 1975, for a headquarters for the Bicentennial Committee of the County of Monroe and the Bor-

ough of East Stroudsburg, which lease was for a term of one year from June 1, 1975, through June 1, 1976.

22. The propane tanks lodged within the William Starbird grant are used to fuel switch heaters necessary for operations in cold weather. They are operable.

23. Until December, 1978, CONRAIL maintained a man full-time in the switch tower at Analomink Street. Thereafter, they had a man there, and still do, whenever the local freight service runs. Inter alia, from the tower, he throws switches and controls the highway crossing gates for Analomink and Crystal Streets. As of August, 1980 CONRAIL had a truck stationed at the switch tower.

24. The "bungalow" houses relays and other components of an electrical switching system, which system includes Switch No. 23. No. 23 is thrown from the switch tower. Impulses are driven through the bungalow and down the pole line standing within the William Starbird grant.

25. The "no trespassing" sign, wooden and well-worn, apparently was erected well before 1978. It references the "Lackawanna Railroad."

26. Parcel "B" and what used to be South Kistler Street adjoining it are now part of a municipal metered parking lot installed as part of East Stroudsburg's Community Development Project. Pursuant to negotiated agreement, within that parking lot, behind the switch tower and within parcel "B" CONRAIL has been given several non-metered parking spaces. One of these houses CONRAIL's truck. The others are used by CONRAIL employes. These parking spaces are where railroad employes had parked before the declara-

tion of taking was filed. The authority knew, and had agreed before the taking, those spaces were to be assigned to the railroad.

27. During negotiations before the declaration of taking was made, the authority agreed to give, and subsequently did give, CONRAIL a 20 foot right of way easement over parcel "B." That easement is for providing access to the aforementioned propane tanks.

28. The authority has agreed to give, and has given, CONRAIL an easement out of parcel "A" at the corner of Analomink and Crystal Streets for the highway crossing gate there.

29. Excepting for a roof overhang and vestibule frame which front on Crystal Street, those portions of the railroad station included in the declaration of taking are within the Franklin Starbird grant. The overhang and vestibule frame are within the William Starbird grant.

30. Following the departure of its freight agent from the station on March 31, 1976, CONRAIL employed the building until the fall of 1977 as a reporting point for a crew which worked the local freight service. That crew reported five or six days per week. The crew members read bulletins at the station. There was a telephone there for them to use. They employed lockers and rest rooms in the building.

31. In January, 1976, the Borough of East Stroudsburg formally adopted its Community Development Project. That plan established the railroad station as the focal point of the rehabilitation effort for the Crystal Street area. Acquisition of the station was identified as a "short-term objective."

32. Early in the Spring of 1976 Donald Gage, then the Borough Manager of East Stroudsburg,

notified CONRAIL that the station was to be acquired. At that time CONRAIL had no plans to abandon the station, nor any plans to move its crew from it. The crew moved out of the station because CONRAIL knew the building was to be acquired by the authority.

33. The deed by which CONRAIL acquired the property of the Erie-Lackawanna, including the premises comprising parcels "A" and "B," was made March 31, 1976 by trustees of the Erie-Lackawanna, "free and clear of any liens or encumberances" under section 303(b) of the aforementioned Regional Rail Reorganization Act.

## DISCUSSION

Initially, we shall consider the nature of the interests which were created by the two grants which constitute the grounds in question. Viewing the 1853 grant in its entirety, we find an agreement to grant a right of way, but subject to a condition precedent. Only upon the event that the railroad should be graded and completed across his lands, did Franklin Starbird ". . . covenant and agree to execute and deliver to [the Railway] Company a release of all damages and for right-of-way to said Company. . . ." The later appearing provision that the agreement would only become null and void upon the Railroad Company's decision not to locate and construct their railroad on the right of way only becomes meaningful in this light.

There may, however, be an implied condition subsequent with regard to the cessation of using the land for railroad related purposes, but only because we are not dealing with a fee. The 1853 agreement concerns only a right of way and not title to the land itself. As such, the Railroad Com-

pany merely acquired an easement for right of way purposes, leaving the fee subject to a servitude in the grantor. See generally, Flech v. Universal-Cyclops Steel Corp., 397 Pa. 648, 156 A. 2d 832 (1959); and Dalton Street Railway Co. v. Com. 53 D. & C. 650 (1945).

A right of way acquired by a railroad has been generally recognized as more than a mere easement, but less than a fee: 74 C.J.S Railroads §84(2). On the one hand there is the railroads' perpetual right to actual possession of the surface, at least as long as it is used for railway purposes. On the other hand, the grantor continues to retain some interest by which he supports his reversion, although said reversion is of nominal value only. Id.

Where a fee is granted, the mere expression of purpose has been held not to be sufficient to debase the fee. See Loechel v. Columbia Borough School District, 369 Pa. 132, 85 A. 2d 81 (1952). This is, of course, derived from "the policy of the law favoring the alienability of land. . . ." Id. at 135, 85 A. 2d at 82. Furthermore, the recognition of an implied condition subsequent to an easement promotes this policy, since the existence of the easement interferes with the alienability of the fee.

The 1855 deed, however, is more definite with regard to the types of legal interests which it creates. Although there is no specific reverter clause, the words "so long as the same are used for Railroad or Depot purposes" are sufficient in this circumstance to create a fee simple determinable estate in the grantee-railroad and a possibility of reverter in the grantor. See generally, Peters v. East Penn Township School District, 182 Pa. Superior Ct. 116, 126 A. 2d 802 (1956).

The relevant interests having been defined, we shall proceed to the real issue of the case, which is,

to wit: whether CONRAIL, by allowing the subject property to be used for certain non-railroad related purposes prior to the date of the taking, has permitted the property interest to revert to the grantor's heirs. The only instance of such non-railroad related use, however, was the one year lease of a portion of the East Stroudsburg Station to the Borough of East Stroudsburg for the use of the Monroe County Bicentennial Committee.

At the time of the taking both grants continued to be used, at least in major portion, for railroad related purposes. It is our view that partial minor and temporary deviations from an intended purpose will not result in a reversion and forfeiture. For the court to hold otherwise would mean the easement or fee created could be reduced in piecemeal fashion, with those areas being used in non-railroad related endeavors being subject to forfeiture or reversion, leaving intact those areas being properly used. This would be an untenable result in this particular circumstance, because of the ensuing difficulties in determining the extent and valuing the portions affected. As noted in finding of fact no. 10, only a portion of the East Stroudsburg railroad station structure was leased for non-railroad related purposes. However, any pecuniary benefit accruing to CONRAIL on account of the non-railroad related activities should perhaps inure to the grantor. Since CONRAIL leased that certain portion of the station premises for the nominal sum of only $1.00, such a consideration is of little moment.

The final issue concerns the determination of those persons or entities who are entitled to compensation as a result of the partial taking of the aforementioned railroad right of way and fee simple determinable. As a general rule, the condemnation of a railroad right of way entitles the railroad to

be paid for the value of the property which is taken. Under this view, which we adopt, a reversioner's interest is the fair market value of his interest at the time of the taking, but since the railroad is not considered to have forfeited its estate by virtue of yielding to condemnation power, the reversioner's interest has no fair market value: 29A C.J.S., Eminent Domain §147(a). Assuming that the possessory estate of an owner of a fee simple determinable is not about to imminently end, the owner of that estate is entitled to the same compensation that would be received by an owner of an estate in fee simple absolute. As with the reversion in the railroad right of way, under this circumstance the future interest likewise has no ascertainable value: Restatement, Property, §53; Borough of Warren v. Conewango Realty Corp., 57 D. & C. 2d 627 (1971). As such, regarding both tracts of land, it is CONRAIL who is entitled to the whole amount of the compensation to be received from the partial taking.

## CONCLUSION OF LAW

1. The Franklin Starbird grant created a railroad right of way, which constitutes a special form of easement, although not an estate in fee simple absolute; that grant being created subject to an implied condition subsequent that if the right of way should cease to be used for railroad purposes, there would be a reversion to the grantor.

2. The William Starbird grant created an estate in fee simple determinable to the predecessors of CONRAIL.

3. There have been no events which would legally constitute the occurrence of an event that would signify the end of the possessory interest of

CONRAIL in the fee simple determinable estate regarding the William Starbird grant, or that would signify the happening of the implied condition subsequent regarding the Franklin Starbird grant.

4. CONRAIL is entitled, on account of its railroad right of way, as per the Franklin Starbird grant, to the entire compensation awarded on account of the partial taking of said Franklin Starbird grant.

5. CONRAIL is entitled, on account of its fee simple determinable estate, as per the William Starbird grant, to the entire compensation award on account of the partial taking of the said William Starbird grant.

6. Respondents, since their future interests in the Franklin Starbird and William Starbird grants had no ascertainable value as of the time of taking, are not entitled to any of the compensation awarded on account of the partial taking of lands contained within both grants.

7. Any rights to the condemnation fund which lien holders may have had were extinguished by the free-and-clear conveyance of the Erie-Lackawanna premises into CONRAIL made March 31, 1976: 45 U.S.C.A. §743(b)(2).

8. (a) CONRAIL is entitled to reimbursement in the amount of $500 as payment for reasonable expenses actually incurred for attorney and engineering fees: Eminent Domain Code of June 22, 1964, P.L., (Sp. Sess.) 84, as amended, 26 P.S. §1-610; and

(b) CONRAIL is entitled to delay compensation, at the rate of six per cent per annum on the amount deposited as just compensation, from March 14, 1978 to July, 1978: 26 P.S. §1-611; and

(c) CONRAIL is entitled to all of the interest earned by the condemnation fund since it was deposited in an interest-bearing account.

## ORDER

And now, March 27, 1981, the court decrees that judgment be entered in favor of Consolidated Rail Corporation in accordance with the conclusions of law.